The last oral case on the docket is the case of People v. People of the State of Illinois v. Kevin Koontz. We have Ms. Fazal. Good enough? Well, tell me how you would like, actually, you would prefer. It's Fazal. And we have Ms. Stacy. You may proceed, Ms. Fazal. Good afternoon, Your Honors. May it please the Court? My name is Shana Fazal and I represent Kevin Koontz, Ms. Peel. This Court should reverse Mr. Koontz's conviction or remand for a new trial because the evidence in this case does not support his guilt beyond a reasonable doubt. Here are the basic facts as they were reduced at trial. The victim, Rochella Barnes, who is Kevin Koontz's cousin, claims that he came to their grandmother's house and rubbed the outside of her clothes over her vagina and her breasts. That's it. That's the allegation and that's the extent of the evidence against him. The victim's allegation in and of itself could be enough if it was believable, but the inconsistencies and the lack of other evidence presented to support a conviction cast doubt, reasonable doubt, on Mr. Koontz's guilt. Had the State presented evidence other than the victim and her 12-year-old sister's testimonies, which are unreliable, this case might be weaker for Kevin, but there isn't any other evidence. Here are the problems with this case. I'll just lay them out for you. There's about 10 or 11 reasons. Number one, Kevin was on parole at the time of this incident and had a GPS tracking device that he was wearing on his ankle. He had to wear it at all times. It never tracked him at the location where he was. It had tracked him about an hour prior to the event at his place of work. The parole agent who was monitoring him and monitoring his GPS activity had testified on his behalf at trial that there were times when the GPS might lose its signal when he was inside certain buildings and that might happen quite frequently. But whenever he was outside and exposed to the air, that signal would generate something to the place that was monitoring the GPS signal. And he would have to go from the place of his work to the house where this event happened in broad daylight. Had to walk from the place to his car, then drive to the location, get out of his car, and walk to the house. And he was never tracked on the GPS at any of those times. Not a single adult who testified at the trial or spoke to the police in this case claimed to have seen Kevin at the house, even though five of them had been there at various times during the day. The victim didn't tell her grandparents who were at the home when this allegedly happened that she had just been abused or touched by Mr. Kutz. Her reason was that her grandmother is mean, and so she didn't want to tell her. She did tell her grandfather in part because she claims the grandfather knew how Kevin was, but his grandfather also didn't do anything. Didn't tell anybody, didn't talk to anybody about it, didn't turn anybody into the police. The two people she did tell were her parents, and here's what they did. Her father drove her, allegedly, to her mother's home, dropped her off, and never said anything. Didn't go to the police after she told him, didn't tell the mother, didn't tell anything. The mother waited after she told the mother when the mother came home, waited until the next day to say anything to the police, and her excuse was that she wanted more time to discuss the situation with her daughters first. Kevin's brother, Victor Kutz, was at the grandmother's house at the time that this alleged incident occurred, and he claims Kevin was never there. He was staying there at the time because his house was undergoing renovations. Rhonda Kutz, the defendant's wife, testified that although she and her husband work at different locations for her business, they have a closed-circuit television, and they were able to communicate with each other all day long, and all day long that day they were communicating with one another. Finally... Not during the time the offense allegedly occurred. Well, she couldn't. I mean, it's such a regular communication. She wasn't positive at what times it was that she was actually, you know. I mean, it's something that just happened regularly. She couldn't say that she was or that she wasn't, and there was no evidence presented either way, except that she was confident that she was regularly in communication with him. And he brought, or she brought, Mrs. Kutz brought evidence to the state's attorney and to defense counsel of an alleged extortion attempt by Vincent Smith, the victim's father, the victim herself, and the victim's mother that there had been communications that this case could go away for $10,000. Defense counsel even brought that to the Alton Police Department, and the response that was brought out of trial was just not to do it anymore to the victim's family. On the extortion attempt, you could look at that a couple different ways. Does that mean that the offense didn't happen, the fact that they tried to extort him, or did it happen? I think it just adds weight to the case that there's reasonable doubt in this case, that the only evidence against my client in this case is the victim's testimony that he touched her. There were adults around. None of them can corroborate that this happened. There were adults present in the house. Why does the extortion mean it did not happen? Well, it's because there's no explanation for why it would have happened otherwise. Literally, in this case, he had no reason to go to the house, but they knew that he was already on parole for a prior sex offense. So it could have been. I don't know why they did it or what the reason, what the motivation was behind that, other than for financial gain, monetary gain. Was there any corroboration regarding the alleged extortion attempt? Well, there's testimony from another inmate, Dixie Tillman, who was incarcerated with the defendant at the time, and the defendant testified that he didn't talk openly about having been there for a sex offense because in a penal institution or a jail setting, it's not a popular thing to be talking about that you were a child molester or a sex abuser or convicted of those things. And this gentleman, Dixie Tillman, had a prior relationship with the victim or testified that he had had a prior sexual relationship with the victim and that she had said, I'm trying to get this money on this case, and when I get it, I'll give it to you. They had had this conversation from there, and he had no motivation to testify. In fact, at trial, the state's attorney brought up that she may have been underage during this communication, and he said, well, I didn't know that. And the state's attorney said, well, I imagine you might find out. So, I mean, he was putting himself in jeopardy for doing this. There was no benefit to Dixie Tillman testifying about the extortion attempt. And the defendant's wife did bring it to the defense counsel, brought it to the state's attorney. They miraculously discovered the letter that she sent to the state's attorney about the extortion attempt in the middle of the trial, giving the defendant's defense counsel very limited time to discuss it with his client. And I can't answer your question about what the motivation was behind it, but to me it just adds to the scales. I don't know what the motivation would be that they wanted money. Right, right, right. But I don't see, if it did occur, it doesn't necessarily relate that it didn't happen. Most extortions work better when you actually committed the offense. Right, but in this case, there was also no reason, there's no explanation for him ever to even go to that house. He didn't request permission. Okay, I got that. You see what I'm saying? It could have been that the allegation of the abuse was made as setting the place for the extortion to occur later. Setting him up. Right, because he didn't ask for permission, for example, from his parole agent to go to this address. He would have had to do that to go there, or he would have had to violate his parole to go there, in which case the GPS would have, you know, it's miraculous that the IDOC parole agents, who rarely testify on behalf of parolees and on behalf of clients, that he would come out and say the signal frequently gets lost inside buildings, but when you're exposed to the open air, the signal never gets lost. It, in fact, showed, in the record, you can see the times, like literally to the minute of when he's outside. Was the parole agent subpoenaed? I don't know. He testified, came in voluntarily, or did he come in on a subpoena? I believe he did come in on a subpoena, if I remember correctly. But even so, I mean, his testimony has more veracity, even so, because he is from the Department of Corrections. There's talk about aluminum foil and how that can, who discussed that? Was that brought before the DOC person, too? Did he discuss that? He didn't. Well, the question about whether aluminum foil could cover up a GPS and hide the signal was stipulated to a trial between defense counsel and the state's attorney that the expert would testify. That it could. That it could, right, that it could. And we do know that there was no signal during the period when he alleged. Correct, but there's no allegation that he, the state doesn't even, the state's first allegation of the aluminum foil is that the victim heard him ask his grandmother, do you have any aluminum foil? And by the way, her response to the younger sister was, she said she didn't have any. And he said, well, you got some in the car. This is what. Right, but he would have, but there's no allegation that he ever, there's no evidence that he covered it before he went there. I mean, the talk that he was asking for aluminum foil when he got there almost indicates that he knew he needed to cover it at some point once he got there rather than that he covered it before he got there. There's no evidence to indicate that. Didn't, I can't remember if both of the grandparents were there. Yes. They were both there. The grandfather didn't testify at the trial. The grandmother did testify that he was there, correct? Yes, correct. And neither one of them were told about this. They weren't, they didn't hear anybody screaming. There was no, they didn't hear any cries for help. But the grandmother was telling me that they were part of the extortion attempt. No, the extortion attempt was from. So apparently the judge considered the credibility of the grandmother that in fact he was there on that day at that time. No, she testified that he was not there. Oh, he was not there. Correct. That's correct. None of the adults in this case, the victim's father, the victim's father who picked her up, the victim's mother who dropped her off in the morning, the grandfather, the grandmother, or the defendant's brother, who were all at one point or another at that house, ever testified to seeing Kevin Kuntz there, ever. So when you combine that you have five adults who have never seen him there, three of whom were actually in the house when this allegedly happened, and the other two, the brother and the two grandparents, they were allegedly at the house. They all testified they were there. Well, the grandfather didn't testify that he was there, but the grandmother did testify that the grandfather was there. They were all three there when this allegedly happened, never saw Kevin, testified that they didn't see him. So I'm sorry. Thank you. Thank you. Your Honors, Counsel, may it please the Court, my name is Kelly Stacey, appearing on behalf of the people. In cases like this one where a defendant alleges that he was not convicted upon proof beyond a reasonable doubt, a reviewing court must ask itself whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. The question then is whether any rational trier of fact could have found the essential elements of the crime of aggravated criminal sexual abuse beyond a reasonable doubt. As Your Honor alluded to, this case turns on the credibility of the witnesses. The trial court was in the best position to make that determination. It saw and heard the witnesses and examined their demeanor at trial. The defendant argues that he shouldn't have been convicted because he had adult witnesses and there was two children who testified, one was 16 who was the victim and one was 12. But it certainly isn't the law that an adult is inherently more credible than a child. That's not the law at all. It was never raised at the trial court level. Ms. Stacey, what is the relationship between all the players in this? Isn't there a familial relationship? There is. The defendant is a cousin to Richella B., the 16-year-old. Her sister was in an adjoining room. The grandparents are related to the defendant as well? The Mr. and Mrs. Teague were the defendant's aunt and uncle and Richella B., the Teagues, are her grandparents. The defendant is arguing that this case is only based on speculation, that there was no certainty to the testimony presented, and that Richella B. was inconsistent in her testimony. But I think the record shows just the opposite. It shows that her testimony was entirely consistent, and not only that, it matched that of her sister, Richonda. The defendant argues that this court should override the credibility determination of the trial court, which found that Richella B. was credible, her sister Richonda was credible, and her mother and dad were credible. The defendant is essentially asking this court to retry him on appeal, but he concedes that the evidence is to be viewed deferentially and in the light most favorable to the state. The evidence showed that the defendant was a convicted sex offender with a global positioning system device, one attached to his hip and one to his ankle. The evidence showed that the defendant entered his aunt's home looking for aluminum foil that day. The inference then is that he knew aluminum foil would block the satellite tracking system, and he wanted to interfere with that tracking device to avoid detection. The signal happened to be blocked at the very time the defendant was at his aunt's home. It's clear that he had already obtained the aluminum foil and needed more. Richella B., the victim, testified she heard the defendant tell her grandmother, Mrs. T., that he had aluminum foil in his truck. The defendant went inside of the house, approached his 16-year-old cousin, grabbed her breast, and sexually abused her. Her 12-year-old sister sat at the end of the couch where she could see directly into the room, saw exactly what happened. This isn't merely the testimony of adults versus children. Two eyewitnesses saw what happened here. The defendant himself testified that the court found he was not a credible witness. All of the other adults were not in that room, and they weren't in the adjoining room. They could not have seen what happened. They couldn't have even heard what happened. The defendant's evidence was faulty and unreliable alibi testimony. He said he was wearing a satellite device so he couldn't be in there. We see that there was approximately an hour and 45 minutes where he wasn't able to be tracked at all. My recollection of what occurred is that the testimony presented was that there were security cameras at both locations. Mrs. Koontz was at one location. Mr. Koontz was at the other store location. Apparently there are four days' worth of video that are kept, but the video had apparently already been destroyed by the time trial came up, and the defendant, according to his testimony and that of his wife, they were unable to obtain a copy of that videotape. Can I ask you about the alleged extortion? What proof was there? Well, I think the trial court found that that just seemed to be a flimsy excuse. Supposedly, Mrs. Koontz got a telephone call from Rochelle Abbey's mother, Bridget. However, when she was questioned at the trial court, she couldn't even determine whether or not the voice speaking to her was that of a man or a woman. The evidence, if you want to call it evidence, of any extortion attempt was primarily and almost exclusively by Mrs. Koontz. Her testimony was that she filed a report with the state's attorney's office. Anyone can make an allegation that extortion happened, but there's no evidence other than this alleged phone call that could have been a man or a woman saying, we can make this case go away if you pay $10,000. Now, there was testimony from a man named Dixie Tillman who incredibly alleged that he was 18 years old and that he was having a sexual relationship with Rochelle Abbey, attempting to smear her credibility in the trial court. This Dixie Tillman, his testimony was all over the place. He contradicted his own affidavit. He simply couldn't be redeemed as a witness. So that's the extent of any extortion evidence. I think the evidence presented to the trial court was this defendant entered that home, he took liberties with his cousin that he was not entitled to take, two witnesses saw him do what he did, and that evidence was sufficient to convict him. Even if you take the defendant's argument as true, that there was conflicts in the testimony presented, a court of review does not substitute its judgment for that of the trier of fact on those credibility issues. The trial court was not required to accept the defendant's version of the events. It was not required to accept his alibi. There was a huge gaping hole in that alibi, and it was unsupported by the record. All of the defendant's claims of error center around factual disputes. The resolution of factual disputes is for the trier of fact, along with the assessment of the credibility of the witnesses. In a sufficiency of the evidence claim, this court does not need to decide whether it believes that the evidence established guilt beyond a reasonable doubt. Just whether or not the evidence supports the finding that any rational trier of fact could have found the elements of the crime beyond a reasonable doubt. In this case, there was plenty of evidence establishing it. In criminal cases like this, testimony of one credible witness is sufficient to convict. Here we have the testimony of two. No evidence at all that these two girls lied about what happened. This alleged extortion evidence, the trial court saw through it for what it was, simply untruths presented at the trial court. Was there any evidence of the young ladies having a motivation to lie? Was there some conflict within the relationship with their cousin? There was nothing brought out about any prior problems with the cousin. No evidence at all that there was any motivation to fabricate or bring a false claim against the defendant. In this case, the answer is very clear and resounding that there was evidence sufficient to convict, so the people would respectfully ask this court to affirm the decision of the trial court. Thank you. Thank you. Do you have a summary level? Yes, Your Honor. I understand the state's argument that we're asking this court to retry on appeal, and I would respond that there's a liberty interest here that matters just as much as the justice that gets done, and in this case, I think that those interests are the same. There was, to answer your question, motivation for the father, the victim's father, to have at least a difference with the defendant in that the business that the defendant and his wife owns is a licensing business, and a business that gives insurance, other things like that, and he had wanted Mrs. Coons to do that, to give him some licenses at a discounted rate or not pay for it the way he was supposed to. She didn't do that, and he and Kevin got into a fight. So there is some bad blood here that happened before this alleged event happened, so I just wanted to correct you. That was in the record in the defendant's testimony, yes. Is that inconsistent with the fact, though, you pointed out earlier that he didn't do anything after he found out about this? He just dropped her off. This was before. But if he had something against her and they were fabricating this whole thing, wouldn't it be consistent that he'd immediately go to the police with this story? That the defendant would go to the police with this story? No, the father. Well, I mean, this argument that they had had happened months before, I believe months before this happened. I know, but if the theory is that he would help her fabricate this, wouldn't he do a better job of it rather than just taking her home and dropping her off? I mean, I don't know about the meritocracy of how well people can put together extortion attempts, but it's just building in terms of how many people here were involved with her apparently telling them what had happened and the delay in doing something about it or the inaction at all of doing anything about it. I mean, it's almost illogical that your daughter would be groped by somebody who has a history of being a sexual abuser and you would do nothing but drop her off. Well, he didn't have custody, is that correct? He didn't have custody, but he left her there. Her mother wasn't even home yet. I mean, he just dropped her and her 12-year-old daughter off at the home. And the mother, when she got home, waited another 24 hours or close to 24 hours to go to the police about it. And incidentally, Mr. Koontzman... Didn't he talk to her though? Didn't the father talk to the mother? Yes, he had a phone conversation with her, but he still left her alone after she's allegedly very upset. I mean, her testimony was that she was traumatized by this event, the victim's testimony, and he just dropped her off there. I mean, that phone call she had with him allegedly was a very traumatic phone call where she was hysterical crying, and yet he still just dropped her off there at the house without any other adult supervision there. And incidentally, Mr. Koontz and his wife, as soon as they understood there was this allegation made against them, they contacted Mr. Koontz's brother, who's a police officer in Missouri, and he advised them to turn himself in, and he went right away to the police station. So again, these are actions that are much more, to me, consistent with somebody who's not done something wrong and certainly wanted to clear the air. And again, I would emphasize that he didn't ask for permission to ever go to this house. The state argues that we're saying everything is speculation, and what they argue is that there's an inference that he knew that he covered up his GPS with aluminum foil, which is the definition of speculation. So they're almost making the point. They just stated it's clear that he obtained aluminum foil. It's not at all clear that he obtained aluminum foil from any place. There's literally nothing in the record that says it's evidence that he had aluminum foil, put it over his GPS, left his place of business, got into his car, drove to this house, got out of the house, and then went in there and abused this girl. I thought one of the witnesses, one of the minors said he asked for aluminum foil and he had it. Isn't that an admission on his part? Isn't that evidence? Well, their argument is that he clearly came there with aluminum foil. I know it's their argument, but there was evidence of that. There's evidence that he said he had aluminum foil in his pickup truck. Couldn't the judge believe that? That's the extent. I agree with you. The judge believed that. I'm arguing that the judge's decision in this case was erroneous because the evidence is overwhelming to cast some reasonable doubt in this case. And where there's reasonable doubt, there can't be a conviction. No more questions? Thank you. Thank you, Ms. Cassell. And Stacy will take a piece of your advice. But that concludes our oral arguments for today. Please stand and be seated. All rise.